MOORE, J.
11 Jeremy Wayne Elkins appeals his conviction of molestation of a juvenile, La. R.S. 14:81.2, and his sentence of 25 years at hard labor without benefits because the victim was under the age of 13. We affirm and remand for compliance with sex offender notice and registration.

Factual Background

In late 2010, nine-year-old AK told her grandmother, Rebecca Adams, “I need to tell you something that’s real bad.” She continued that someone named Jeremy took her to a vehicle, put her in it, and then “pulled my panties down, and he hurt me real bad.” Ms. Adams did not know who Jeremy was, so she asked and AK replied he was “dad’s friend.” Ms. Adams promptly phoned AK’s mother, Amy Bartlett, who recalled that some two years earlier, AK had been spending time with her dad, Chris, at Jeremy’s house in rural DeSoto Parish. Amy recalled Ms. Adams telling her that AK had been asleep on Jeremy’s living room couch one night when Jeremy woke her up, took her to a red car, and then touched her with some lotion; when Chris yelled for her, Jeremy brought her back to the porch, and AK told him her panties were not on. Ms. Bartlett asked AK about this, and AK replied that Jeremy had put the lotion “down here,” pointing at her vagina. Ms. Bartlett called the sheriff’s office, which told her to take AK to Gingerbread House for a forensic interview.
Sarah Lynam Jose, a forensic interviewer at Gingerbread House, interviewed AK. Ms. Jose showed AK anatomical drawings on which AK indicated that Jeremy had touched her “wiener” (vaginal area) and “butt” (buttocks). According to Ms. Jose, AK said it happened at “her father’s house,” a vehicle was involved, an item of clothing was missing, and |2critically, this all happened “a couple of years prior.”
Ms. Jose conducted a video interview of AK on November 29, 2010, at 10:22 am. On the DVD, AK stated that she was not talking about her stepfather (also named Jeremy), but about a “different Jeremy”; Jeremy “sniffed on her and carried back inside” and put “stuff” on her; she left her panties in the car; she honked the horn and Jeremy left her there; she had been asleep on the floor and then asleep on her father’s lap; she woke up to Jeremy sniffing on her face; Jeremy had her in a red car and put “stuff on her under her underwear”; the “stuff’ hurt her, and his fingers were touching her; she started honking the horn; this happened when she was seven years old; Jeremy touched her “butt and wiener,” and she “was hurt” later on when she went to the bathroom; her dad asked her where she had been, but he did not understand her; she could not remember Jeremy’s clothes, and he would not let her go to the bathroom. Finally, Ms. Jose stated that because the incident was two years prior, she did not order a sexual assault examination. Another Gingerbread House employee, Jennifer Flippo, testified as an expert in child forensic interviewing. She stated that delayed reporting is a common phenomenon, as child victims try to avoid harming themselves or feeling guilty.
On the strength of the Gingerbread House statement, Deputy Hensley of De-Soto Parish Sheriffs Office interviewed Jeremy, who admitted that AK and her dad had been at his house in Stonewall. Jeremy stated, however, that he was outside when AK came out of the house, saying she needed to “wee”; she was having trouble getting her clothes off, so he helped her.
AK’s dad, Chris, testified that one night in 2008, “something odd” | «¡occurred. He and AK were at Jeremy’s house; that night, AK fell asleep on his lap on the *772 couch; Chris left her there and went to a bedroom; later, Jeremy’s wife, Brandi, woke Chris up, wanting to know where Jeremy was; Chris looked on the couch and saw AK was no longer there; he went to the back door and “hollered” for AK; he saw some taillights through the bushes and heard AK shout back, “Daddy!”; then Jeremy emerged from the bushes, carrying AK in his arms. He recalled there was a red car parked on the premises, roughly where Jeremy and AK had been. Chris recalled this happened in 2007 or '08, although he initially told Dep. Hensley it was three or four years prior.
Jeremy’s former wife, Brandi, corroborated that for a while, Chris and his girlfriend were in the habit of bringing their kids over to the Elkinses’ trailer in Stonewall and often stayed the night. She also agreed that the kids played outside, used the bathroom outside, and it would not be unusual for them to go outside at night. She recalled one night when she heard the “General Lee” horn on Chris’s truck; this woke her up, and they went outside to see, but she denied that she woke up Chris or asked him where Jeremy was. It turned out the sound was from AK sitting in the truck, which could not be seen from the steps of the trailer, and Chris carried her back into the house. She repeated that she was not the one who woke up Chris that night.
Based on the Gingerbread House video and interviews with Jeremy and other witnesses, the state obtained an indictment for molestation of a juvenile in January 2011.
The matter proceeded to jury trial in March 2018. The witnesses | testified as outlined above; the DVD of AK’s Gingerbread House interview was played for the jury. Now 12 years old, AK herself testified, confirming that everything she said in the video was true. On cross-examination, she admitted she was not sure how long ago the incident occurred; she also stated that she was sitting in her dad’s truck, blowing the horn, when her dad woke up and came to get her.
Jeremy took the stand in his own defense. He admitted giving a statement to Dep. Hensley in December 2010, telling her the only things he could think of with respect to the accusation: late one night, when the kids were at his trailer, they wanted to go to his mother’s trailer, some 200 yards or so behind his own, and he wouldn’t let them; AK said she needed to use the bathroom, and he told her to go behind the tractor; he helped her pull down her britches, and afterward carried her back to his trailer. He also recalled a separate incident in which he was in bed asleep when he was awoken by the sound of a horn blowing; he went outside and found it was AK sitting in the truck, blowing the horn; he picked her up, carried her back inside, and put her to bed. He resolutely denied that on these occasions, or any occasion, he ever removed any of AK’s clothing, put anything on her or in her, or did anything sexual with her. He admitted telling Dep. Hensley that he was “wrong doing that,” but said he was referring to picking up AK as though she were his own child. He reiterated that the bathroom incident and the horn incident were two separate occasions.
As noted, the jury unanimously found Elkins guilty as charged of molestation of a juvenile. He filed a motion for post verdict judgment of acquittal, which the district court denied in June 2013. Elkins waived ^sentencing delays. The district court stated that it had received and reviewed a presentence investigation report, showing that Elkins is a first felony offender, but that the penalty of R.S. 14:81.2 D(l) is mandatory, so the court did not consider any other factors. Stating that *773 the mandatory minimum was “more than sufficient,” the court sentenced him to 25 years at hard labor, without benefits. El-kins filed a motion for reconsideration, which was also denied. This appeal followed.

Discussion: Sufficiency of Evidence

By his first assignment of error, Elkins urges the evidence was not sufficient to support the conviction in this matter. He argues that he was convicted based on the allegations of the victim, AK, but the evidence was not consistent with her allegations. He shows:
• AK testified that she was asleep on the couch when Jeremy picked her up and carried her away from her father’s lap, but her father testified that she fell asleep in his lap and he left her alone on the couch;
• AK’s father, Chris, testified that he yelled outside for her, but AK did not testify that he yelled for her;
• AK testified that Jeremy took her to a red car with seats, a steering wheel, and lots of junk in it, but Jeremy testified that the car was stripped down;
• AK testified that her panties were removed, and her mother testified that AK told her this, but her father did not see anything odd with AK’s clothing;
• Chris testified that Jeremy’s wife, Brandi, woke him up looking for Jeremy, but Brandi testified that she and Jeremy were awoken by Chris’s distinctive truck horn;
• Chris testified that he had been drinking and had not heard the sound of the horn, but AK, Brandi and Jeremy all testified they heard the horn;
• Chris testified that he saw a light through the bushes, but the [ fisource of the light was never explained, and the car did not have a dome light or battery;
• AK’s mother, Amy, testified that she did not know that Chris and their daughters were staying at Jeremy’s house, but every other adult witness knew about this arrangement;
• Chris testified the incident occurred in 2006 or 2007, Amy’s mother put it in November 2007, Dep. Hensley put it in 2008, and the indictment charged it occurred between May 1 and November 30, 2008;
• Jeremy and his ex-wife, Brandi, both testified they separated in early 2008, so there is no way Brandi would have been there in late 2008;
• Amy testified she did not report anything in 2008 because she did not have sufficient evidence;
• Amy heard the story in 2008 and took no action; she heard it again in 2010, the only difference being that the grandmother, Ms. Addison, also heard it then.
Elkins stresses that AK’s testimony was inconsistent with all the other witnesses and lacked any corroborating physical evidence; he suggests this leaves open the reasonable hypothesis that if AK was touched by anybody, it was by her stepfather, Jeremy.
The state responds that AK’s reports to her mother and grandmother, Gingerbread House interview and trial testimony were consistent and proved every element of the offense. The testimonial discrepancies, it submits, do not provide grounds for reversal.
The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a *774 reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Jackson, 2009-2406 (La./19/ll),7 55 So.3d 767. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Calloway, 2007-2306 (La.1/21/09), 1 So.3d 417; State v. Carey, 47,650 (La.App. 2 Cir. 2/27/13), 110 So.3d 221, writ denied, 2013-0726 (La.11/1/13), 125 So.3d 417. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Dorsey, 2010-0216 (La.9/7/11), 74 So.3d 603; State v. Singleton, 48,114 (La. App. 2 Cir. 6/26/13), 117 So.3d 306. A reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, 2005-0213 (La.1/19/06), 921 So.2d 94; State v. Singleton, supra. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La.4/1/05), 898 So.2d 1219; State v. Singleton, supra. This is equally applicable to the testimony of victims of sexual assault. State v. Ware, 2006-1703 (La.6/29/07), 959 So.2d 459; State v. Humphries, 48,235 (La.App. 2 Cir. 9/25/13), 124 So.3d 1177. Such testimony alone is sufficient even when the state does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Seaton, 47,-741 (La.App. 2 Cir. 4/10/13), 112 So.3d 1011, unit denied, 2013-1056 (La.11/15/13), 125 So.3d 1102, and citations therein.
The essential elements of the crime of molestation of a juvenile are (1) the accused was over the age of 17, (2) the accused committed a lewd or | ^lascivious act upon the person or in the presence of a child under the age of 17, (3) the accused was more than two years older than the victim, (4) the accused had the specific intent to arouse or gratify either the child’s sexual desires, or his or her own sexual desires, and (5) the accused committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm or by the use of influence by virtue of a position of control or supervision over the juvenile. La. R.S. 14:81.2 A; State v. Terry, 47,425 (La.App. 2 Cir. 11/21/12), 108 So.3d 126, writ denied, 2012-2759 (La.6/28/13), 118 So.3d 1096, and citations therein.
Matters of record establish that AK was born in December 2000 and Elkins was born in December 1976, thus satisfying the age-related elements of the offense. Touching the victim’s genitals satisfies the elements of a lewd or lascivious act and the intent to gratify the offender’s or the victim’s sexual desires. State v. Terry, supra; State v. Hillman, 613 So.2d 1053 (La.App. 3 Cir.), writ denied, 617 So.2d 1181 (1993). Testimony that Elkins was a good friend of AK’s father, frequently hosted AK’s family for overnight visits and helped AK undress to use the bathroom satisfies the element of authority.
The only issue is whether AK’s account of Elkins’s conduct was so internally inconsistent or irreconcilable with physical evidence that no rational juror could have accepted it. State v. Higgins, supra; State v. Singleton, supra. Even from the impassive record, this court can see some basis for questioning AK’s credibility, given the two-year delay before she reported the incident, and her somewhat rambling delivery on the DVD and Ron the witness stand. However, AK was only seven years old at the time of the incident, and her mother admitted that the child “had a hard time expressing herself.” Ms. Flippo, the *775 expert in child forensic interviewing, explained why a child might delay reporting and candidly admitted that such reporting can yield either false or valid complaints. Ms. Jose, the interviewer on the DVD, explained that two years after the fact, a sexual assault examination would probably not be useful. On this record, the jury could reasonably find AK to be a credible witness.
Moreover, AK’s various reports to her grandmother, mother and Ms. Jose, and her testimony at trial, were consistent in describing the conduct and attributing it to Elkins. The testimony of the other adults present, Chris and Brandi, varied in some particulars, but in ways that reflect those witnesses’ recollections of an event they probably did not consider important years earlier. Elkins’s own testimony attempted to describe two incidents that AK recalled as one. Tellingly, he admitted he was with the child and pulled down her pants; the jury obviously rejected his claim that nothing else happened. On this record, we do not find that evidence fails the standard of State v. Higgins and State v. Singleton, supra, or that we must reverse the jury’s credibility call.
This assignment does not present reversible error.

Sentence Review

By his second assignment of error, Elkins urges the court imposed an unconstitutionally harsh and excessive sentence. He concedes that for the offense of conviction, R.S. 14:81.2 D(l), the mandatory minimum is 25 years at hard labor without benefits, which he received, but argues that even |10this was not tailored to the offense and offender. He cites his steady work as a forklift operator, and his status as the custodial parent of his two children after he and Brandi separated, as facts militating against the statutory minimum.
The state responds that the court gave the “most lenient” sentence available, and that Elkins preyed upon a sleeping child, as supporting the sentence imposed.
Appellate review of sentences for excessiveness is a two-pronged inquiry. First, the record must show that the sentencing court complied with La. C. Cr. P. art. 894.1. The court need not list every aggravating or mitigating factor so long as the record reflects that it adequately considered the guidelines. State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819; State v. Linnear, 44,830 (La.App. 2 Cir. 12/9/09), 26 So.3d 303. No sentencing factor is accorded greater weight by statute than any other sentencing factor. State v. Taves, 2003-0518 (La.12/3/03), 861 So.2d 144; State v. Linnear, supra.
A mandatory minimum sentence is presumptively constitutional. However, a defendant may rebut the presumption by showing, clearly and convincingly, that he is “exceptional,” meaning that “because of unusual circumstances this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.” State v. Celestine, 2012-0241 (La.7/2/12), 92 So.3d 335; State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. When the statute of conviction imposes a mandatory minimum sentence, and the defendant makes no such showing, | ndetailed compliance with Art. 894.1 is not required to justify the statutory minimum. State v. Robert, 2006-1872 (La.3/9/07), 951 So.2d 1057; State v. McDonald, 33,013 (La.App. 2 Cir. 3/1/00), 754 So.2d 382.
The second prong is review for constitutional excessiveness. A sentence violates La. Const. Art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a *776 purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Lobato, 603 So.2d 739 (La.1992). A sentence is deemed grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. State v. Guzman, 99-1753 (La.5/16/00), 769 So.2d 1158. The sentencing court has wide discretion in imposing a sentence within statutory limits. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7.
The penalty for molestation of a juvenile when the victim is under the age of 13 is hard labor of not less than 25 years and not more than 99 years, without benefit of probation, parole or suspension of sentence. La. R.S. 14:81.2 D(l).
The court cited the sentencing guidelines and the information in the PSI. Notably, the court had presided over a three-day trial (including jury selection) with substantial testimony and a DVD of the victim’s Gingerbread House interview. Although its formal statement of a factual basis for sentence was spare, the court obviously had a thorough grasp of the facts of the offense and of Elkins’s social history. The court considered the statutory | ^minimum “more than sufficient,” and the record illumines this conclusion. Although the sentence of 25 years is admittedly quite lengthy, we simply cannot conclude that his work and social history make him the “exceptional offender” contemplated by State v. Celestine and State v. Johnson, swpra.
The assignment of error does not present reversible error.

Error Patent Review

On our own motion, the court notices that the offense of conviction, R.S. 14:81.2, is a “sex offense” as defined by La. R.S. 15:541(24)(a) and thus carries the requirements of sex offender notification and registration under La. R.S. 15:542 and R.S. 15:543.1. This record does not show that the district court gave Elkins the forms or oral advice to which he is entitled. The matter is therefore remanded solely for the purpose of compliance with these statutes. State v. Hough, 47,308 (La.App. 2 Cir. 8/1/12), 103 So.3d 477, writ denied, 2012-1936 (La.3/8/13), 109 So.3d 357; State v. Scott, 42,997 (La.App. 2 Cir. 2/13/08), 975 So.2d 782.
This court has reviewed the entire record and found nothing else we consider to be error patent. La. C. Cr. P. art. 920.

Conclusion

For the reasons expressed, Jeremy W. Elkins’s conviction and sentence are affirmed. The case is remanded for compliance with sex offender registration requirements and for a minute entry confirming that fact.
CONVICTION AND SENTENCE AFFIRMED. CASE REMANDED FOR COMPLIANCE WITH SEX OFFENDER REGISTRATION REQUIREMENTS.